The FOXBORO COMPANY, Plaintiff,

v.

ARABIAN AMERICAN OIL COMPANY,
Saudi-American Bank, and Citibank
International, Defendants.

Civ. A. No. 86–623–K.

United States District Court,
D. Massachusetts.

April 30, 1986.

Douglas P. Woodlock, Allan J. Sullivan, Sally A. VanderWeele, Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

John M. Harrington, Jr., Douglas H. Meal, Ropes & Gray, Boston, Mass., for Arabian American Oil Co.

Richard F. Lawler, William Van Orden Gnichtel, Whitman & Ransom, New York City, for Saudi-American Bank.

Francis H. Fox, Richard L. Burpee, Bingham, Dana & Gould, Boston, Mass., for Citibank Intern.

## MEMORANDUM AND ORDER

KEETON, District Judge.

Plaintiff, the Foxboro Company ("Foxboro"), brings this action against Arabian American Oil Company ("Aramco"), Saudi-American Bank ("Samba"), and Citibank International ("Citibank Int.") alleging "a recent wrongful and fraudulent demand" (Complaint, paragraph 1) made by Aramco for payment upon a guarantee issued by Samba ("the Samba guarantee") on behalf of Foxboro and a letter of credit issued by Citibank Int. on behalf of Foxboro. The Samba guarantee and the Citibank Int. letter of credit were issued in connection with a contract awarded to the commercial representative of Foxboro to provide a process control system for the proposed Qasim Refinery in Saudi Arabia ("the contract"). Since a non-Saudi company is not permitted to enter into contracts directly in Saudi Arabia, the contract for Foxboro's process control system was made on Foxboro's behalf by Foxboro's Saudi Arabian commercial representative, Trading and Industrial Group—Trading, Engineering & Services Co. International Ltd. ("TIG–TESCO").

The contract was unilaterally terminated in March 1985 by Aramco. The termination was effected by a telex of March 16, 1985 from Aramco to Foxboro, declaring: "You are directed to stop performance of all work on the effective date of termi-

nation (March 17, 1985)." Approximately eleven months later, in February 1986, Aramco made demands for payment upon both the Samba guarantee and the Citibank Int. letter of credit.

Plaintiff seeks a declaration that the Samba guarantee and the Citibank Int. letter of credit became null and void upon termination of the contract and seeks preliminary and permanent injunctive relief preventing demand and payment upon the Samba guarantee and the Citibank Int. letter of credit.

The complaint, a Motion for Temporary Restraining Order, and supporting papers were filed at 4:50 p.m., February 20, 1986. Plaintiff sought an immediate ex parte hearing. Upon completion of the ex parte hearing, which commenced after 5:00 p.m., and during which additional supporting papers were filed, the court entered a Temporary Restraining Order ("TRO") at 6:10 p.m. on the same day, Thursday, February 20, 1986. The TRO included the following provisions:

> ORDERED that defendant Arabian American Oil Company ("Aramco"), its officers, agents, servants, employees, subsidiaries, affiliates and all persons acting in concert or participation with Aramco be and hereby are enjoined from making any call or demand or executing any call or demand for payment upon a certain guarantee issued by Saudi-American Bank No. CG–1131–C, or from making or causing Saudi-American Bank to make or execute any call or demand for payment upon a certain letter of credit issued by Citibank International Number CK–11–0173; and it is
>
> FURTHER ORDERED that defendant Saudi-American Bank, its officers, agents, servants, employees, subsidiaries, affiliates and all persons acting in concert or participation with Saudi-American Bank be and hereby are enjoined from making any call or demand or executing any call or demand for payment upon a certain guarantee issued by Saudi-American Bank No. CG–1131–C, or from making or causing Saudi-American

Bank to make or execute any call or demand for payment upon a certain letter of credit issued by Citibank International, Number CK–11–0173; and it is

> FURTHER ORDERED that defendant Citibank International ("Citibank"), its officers, agents, servants, employees, subsidiaries, affiliates and all persons acting in concert or participation with Citibank be and hereby are enjoined from making any call or demand or executing any call or demand for payment upon a certain guarantee issued by Saudi-American Bank No. CG–1131–C, or from making or causing Saudi-American Bank to make or execute any call or demand for payment upon a certain letter of credit issued by Citibank International, Number CK–11–0173.
>
> All such orders to remain in full force and effect until further order of this Court.
>
> The requirement of security being unnecessary in the context of this case, no form of security is required pursuant to Fed.R.Civ.P. 65(c).
>
> Unless an earlier hearing is requested by defendants, hearing on preliminary injunction will be held at 2 p.m., Thursday, February 27, 1986.

## II.

As is common in performance contracts, the contract between Aramco and Foxboro provided for payments by Aramco to Foxboro upon completion and invoicing of each of several stages of the "WORK." Rather than adopting the common practice of providing for a retention of a stated percentage of each invoice as security for completion of all the "WORK" this contract contained a provision for a bank guarantee "in lieu" of a 10 percent retention. It provided that Foxboro ("SELLER") "shall provide" Aramco with a bank guarantee for not less than ten percent (10%) of the amount invoiced. Relevant contractual provisions, including the "in lieu" clause, are as follows:

*SCHEDULE "C"*
*PROCUREMENT CONTRACT*
*NO. 15976/00*

3.4 After approval of each invoice by BUYER REPRESENTATIVE, BUYER will promptly pay SELLER ninety percent (90%) of the amount invoiced under Paragraph 3.1 and one hundred percent (100%) of the amounts certified under Paragraph 3.2. Said payments by BUYER shall not be construed as acceptance of any part of the WORK. Sums retained pursuant to this Paragraph shall be paid to SELLER in accordance with Paragraph 3.5.

3.4.1 In lieu of retaining amount pursuant to Paragraph 3.4 above, SELLER shall provide BUYER with a bank guarantee(s) in a form and from a bank acceptable to BUYER for not less than ten percent of the total amount invoiced pursuant to Paragraph 3.1 above and at least fifteen days prior to the due date of the initial invoice. Said bank guarantee(s) shall be valid and binding until all of SELLER's obligations set forth in Paragraph 3.5 of Schedule "C" and Paragraph 3.0 of Schedule "F" have been fulfilled.

3.5 Following completion and Final Acceptance of the WORK and after fulfillment by SELLER of all of its duties and obligations under this Procurement Contract, SELLER shall furnish BUYER with:

3.5.1 Proof satisfactory to BUYER that all costs incurred by SELLER in the performance of the WORK have been satisfied and paid, that there are no unsatisfied claims for injuries to persons or property (or if such claims exist, then in lieu of the foregoing, SELLER may provide BUYER with appropriate information and covenants sufficient to indemni[f]y and hold BUYER, its employees, and BUYER affiliates, agents, representatives and their employees harmless from any liability connected with said claims) and that no other indebtedness exists in connection with the WORK for which SELLER is responsible;

3.5.2 Any and every document, receipt, statement of account, affidavit or assurance which BUYER requires as necessary or appropriate to ensure immunity to BUYER and its employees, affiliates, agents, representatives and their employees from any and all liens or claims for which BUYER or BUYER employees, affiliates, agents, representatives and their employees might be or become liable; and

3.5.3 Releases to BUYER and its employees, affiliates, agents, representatives and their employees from SELLER, and from each subcontractor or assignee under this Procurement Contract, discharging BUYER and its employees, affiliates, representatives, agents, and their employees, and agents of each of them from all liabilities, obligations and claims arising out of or under this Procurement Contract.

After BUYER's receipt of the foregoing documents and after all adjustments to the Procurement Contract Price and all unsettled matters under this Procurement Contract have been disposed of, SELLER shall submit to BUYER its final invoice for amounts retained pursuant to Paragraph 3.4. Promptly after receipt and verification of said invoice, BUYER shall pay SELLER all outstanding sums properly due and owing.

[Section 3.0, relating to Tax Certificates, is omitted since not relevant to the present controversy.]

Other provisions of the contract concern termination at the BUYER's convenience before completion of the work. These provisions are as follows:

19.0 *TERMINATION BY BUYER*

19.1 *Termination At BUYER's Convenience*

19.1.1 BUYER may, at any time and at its sole convenience, terminate this Procurement Contract or any part of the WORK by giving notice to SELLER specifying the WORK to be terminated and the effective date of termination.

19.1.2 Should BUYER terminate this Procurement Contract or any portion of the WORK in accordance with Paragraph 19.1.1, SELLER shall stop performance of the WORK involved [o]n the effective date of termination. Upon receipt and verification of SELLER's invoice BUYER shall pay SELLER all amounts properly due and owing up to that date. Additionally, BUYER shall pay SELLER, subject to BUYER audit, costs incurred by SELLER within ninety (90) days following the effective date of termination as a direct result of such termination (including but not limited to reasonable cancellation charges actually paid by SELLER to its subcontractors, reasonable demobilization cha[r]ges, and reasonable costs incurred in preserving or protecting WORK in progress at the time of termination), plus an amount equal to fifteen percent (15%) of the foregoing termination costs.

20.0 *SELLER OBLIGATIONS UPON SUSPENSION OR TERMINATION*

If this Procurement Contract or any portion of the WORK is suspended or terminated as provided in Paragraphs 18, 19, and if BUYER so request[s], SELLER shall immediately make every reasonable effort to procure cancellation of some or all existing subcontracts or other obligations entered into by SELLER with subcontractors, suppliers or others upon terms satisfactory to BUYER. Alternatively, BUYER may direct SELLER to take all steps necessary to fully vest in BUYER the rights and benefits of SELLER under existing subcontracts and other obligations with subcontractors, suppliers and others. In addition, SELLER shall do whatever is necessary and approved by BUYER to preserve and protect WORK already in progress and to minimize all costs to BUYER and SELLER resulting from such suspension or termination.

The contract also provides for arbitration in Saudi Arabia of any "dispute or difference between the parties hereto arising out of or relating to this Procurement Contract or any further agreements which may result from it, which is not settled by agreement between the parties...."

III.

On or about March 31, 1984, Foxboro delivered to Aramco a guarantee of performance ("the Foxboro guarantee") of the obligations of SELLER undertaken by TIG–TESCO on its behalf.

On June 17, 1984, Citibank Int. issued its letter of credit to Samba in consideration of Samba's expected delivery of a guarantee to Aramco.

On June 18, 1984, Samba delivered to Aramco its guarantee—a document declaring that Samba

hereby irrevocably and unconditionally guarantees the payment to you of the amount which may rightfully be retained pursuant to the contract as it may be amended from time to time as and when demanded by you.... Further guarantor [Samba] covenants and agrees as follows.

A) Should the supplier fail to fully and faithfully perform the contract, as amended from time to time according to the terms of the contract as so amended as determined by you in your absolute judgment the guarantor shall forthwith[,] on first demand made by [you] in writing and notwithstanding any objection by the supplier[,] pay you such amount or amount[s] as you shall require. Demands made in [ ] writing shall include without limitation demand made by telex[.] [T]he amount payable to you pursuant to this letter of guarantee shall not exceed in aggregate the amount of 3,458,492.00 U.S. dollars[.] [P]ayments due to you pursuant to this letter of guarantee shall be effected by transfer to an account in your name at such bank in Saudi Arabia as you shall stipulate or in such other manner as shall be acceptable to you.

B) Any payments made hereunder shall be made free and clear of, and without deduction for or on account of, any

present or future taxes, levies, imposts, duties, charges, fees[,] deductions or withholdings of any nature whatsoever and by whomsoever imposed.

C) The covena[n]ts herein contained constitute unconditional and irrevocable direct obligations of the guarantor. No alteration in the terms of the contract or in the extent or nature of the work to be performed thereunder and no allowance of time by you o[r] other forbearance or concession or any other act or omission by you which but for this provision might exonerate or discharge the guarantor shall in any way release the guarantor from any liability hereunder.

The covenants herein contained shall be binding upon and inure to the benefit of your successors or assigns, provided that any such assignment or transfer shall be evidenced by a written document.

D) This guarantee shall remain valid and in full force and effect until December 31, 1987 or[,] if earlier[,] the date on which supplier has completed the work required to be performed under the contract. In the event of the supplier not having completed the work required to be performed under the contract by December 31, 1987 this guarantee shall automatically be extended for successive periods of three months each thereafter until the guarantor receives a letter from you that the supplier has completed the work as aforesaid.

E) Guarantor represents and covenants that the amount of this guarantee when added to any other guarantee or surety given[,] loan granted[,] credit extended or other financial liability incurred by the guarantor in respect of the contractor does not exceed twenty five percent (25 percent[)] of the aggregate amount of the guarantor's reserves and paid-in capital.

F) This guarantee is governed by and shall be construed in accordance with the laws and regulations of the Kingdom of Saudi Arabia.

### IV.

Aramco's telex of March 16, 1985, terminating the contract, gave no indication that Aramco was grounding its termination of the contract upon a claim of nonperformance of the contract. Indeed, it made explicit reference to clause 19.1.2, which is a part of "19.1 Termination at BUYER's [Aramco's] Convenience." By the terms of clause 19.1.2, "SELLER shall stop performance of the WORK" when BUYER has given notice of such a termination. Thus, for a period of approximately eleven months before Aramco demanded payment upon the Samba guarantee and the Citibank Int. letter of credit, Aramco's unilateral termination in March 1985 had precluded any performance of "WORK" by Foxboro. Aramco's delay of eleven months after unilaterally terminating the contract before making a demand upon the Samba guarantee and the Citibank Int. letter of credit is circumstantial evidence that Aramco, in March 1985, was not making any claim of breach of obligations of performance of WORK pursuant to the contract by Foxboro. It is even more compelling circumstantial evidence that Aramco was in no sense grounding its termination upon a claim of nonperformance of WORK by Foxboro in any respect. Moreover, the Samba demand on Citibank, by telex of February 13, 1986, provides further circumstantial evidence that Aramco had no legitimate claim of violation by Foxboro of its obligations of performance of the WORK. This Samba demand of February 13, 1986 recites:

> This amount is demanded at this time because Aramco has determined that the supplier has failed to fully and faithfully perform its obligation *to do what is necessary and approved by Aramco to minimize all costs to itself and Aramco resulting from termination of the contract* as required by the terms of the contract.

Ex. C to Citibank Int.'s Answer and Counterclaim (emphasis added).

In an attempt to overcome these compelling inferences, Aramco calls atten-

tion to its letter of August 13, 1985 to TIG–TESCO declaring that contract payments of $25,265,500 had been made before termination, that "Progress to Date of Termination" was in the amount of $18,-131.617, and that the difference of $7,133,-883 was a "Credit Due Aramco per Attached Invoice." Such documentation as is provided by the invoice is entirely conclusional. By a preponderance of the evidence before me, I find that Aramco did not contend at the time of termination in March 1985 that Foxboro was in substantial noncompliance with its performance obligations under the contract and did not purport to any extent to ground its termination on any claim of noncompliance by Foxboro.

## V.

■ Aramco contends that this court cannot properly (and in the alternative should not) make any determination as to whether Aramco's demand on the Samba guarantee was within the terms of the stated guarantee of payment to Aramco of any "amount which may *rightfully* be retained pursuant to the contract...." (Part III, above, emphasis added). Aramco calls attention to the provision of the contract that any dispute under the contract is subject to arbitration. It does not follow, however, that this court is without authority, or having authority, should not exercise that authority, to make a determination as to Foxboro's likelihood of success in prevailing in that arbitration or in some other forum on its claim that Aramco's demand is not one for payment of any "amount which may *rightfully* be retained pursuant to the contract" but is a pretextual demand made for the purpose of gaining an unfair advantage in the ongoing negotiations for final settlement between the parties before resort to arbitration. A common sense reading of the Samba guarantee compels the conclusion that it is limited by the word "rightfully." If plaintiff shows fulfillment of other requirements of the issuance of a preliminary injunction by this court (either against other defendants only, or against Aramco as well), the fact that some elements of the

dispute between Aramco and Foxboro may be subject to resolution only in another forum is not a bar to a preliminary injunction against Aramco. (For even stronger reasons, it is not a bar to a preliminary injunction against other defendants. They were not parties to the contract, and their disputes with Foxboro are therefore not within the scope of the contractual provision for arbitration of any "dispute or difference between the parties hereto....") Indeed, a preliminary injunction to preserve the status quo, even if some elements of the dispute must be resolved by arbitration in Saudi Arabia, is in relevant respects analogous to an injunction to preserve the status quo pending arbitration in other contexts. *Cf. Merrill Lynch, Pierce, Fenner & Smith v. Bradley,* 756 F.2d 1048, 1051–54 (4th Cir.1985) (under the Arbitration Act, 9 U.S.C. § 3, federal district court may grant a preliminary injunction to preserve status quo pending arbitration to resolve commercial disputes); *Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1067 (2d Cir.1972) (same); *Janmort Leasing, Inc. v. Econo-Car International,* 475 F.Supp. 1282, 1294 (E.D.N.Y.1979) (same); *Boys Market, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 253–54, 90 S.Ct. 1583, 1594, 26 L.Ed.2d 199 (1970) (under the Labor Management Relations Act federal district court may enjoin strike pending arbitration where the parties have contracted to mandatory arbitration); *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.,* 353 U.S. 30, 39–42, 77 S.Ct. 635, 639–41, 1 L.Ed.2d 622 (1957) (under the Railway Labor Act federal district court may enjoin strike pending proceedings before the National Railroad Adjustment Board).

Since the only issues before the court at this time concern preliminary injunction rather than the prayers for declaratory relief and permanent injunction, I need not address issues suggested in briefs and arguments as to whether this court must or at least should, when entering final judgment in relation to declaratory relief or permanent injunction, accept as preclusive

any resolution of issues between Aramco and Foxboro that by then may have occurred through arbitration or otherwise.

## VI.

I turn next to examining other arguments bearing upon whether Aramco's demand on the Samba guarantee is for an "amount which may *rightfully* be retained pursuant to the contract...."

Having failed (for reasons stated in Part IV above) to show that the amount demanded may rightfully be retained because of alleged nonperformance of Foxboro as to WORK invoiced before Aramco's "Termination at BUYER's Convenience," Aramco argues that Aramco's demand is nevertheless proper because Foxboro has failed to satisfy its obligations under clause 20.0, "SELLER OBLIGATIONS UPON SUSPENSION OR TERMINATION."

██ I conclude that the terms of the contract are not ambiguous in relation to this contention and that the language of the contract plainly will not bear the construction for which Aramco argues.

I conclude that because the relevant terms of the contract are unambiguous, it is inappropriate, whatever law is to be applied in construing the contract, to consider the affidavits before me regarding matters extraneous to the contract, including negotiations and the "understanding" an affiant had regarding the agreement. Moreover, even if considering these affidavits as factfinder, I do not credit those portions of the affidavits before me that are contradictory of the plain meaning of the words of the contract.

The contract provides that upon termination at BUYER's convenience, "SELLER shall stop performance of the WORK...." Clause 19.1.2. "Upon receipt and verification of SELLER's invoice BUYER shall pay SELLER all amounts properly due and owing up to that date." *Id.* No post-termination payment by BUYER is now at issue, however. Rather, on the evidence before me I find that all payments made by BUYER were made before the termination.

The contract provides that, in the event of termination at BUYER's convenience, "Additionally, BUYER shall pay SELLER, subject to BUYER audit, costs incurred by SELLER ... as a direct result of such termination...." *Id.* Although a claim is made by Foxboro in this action that such a payment for post-termination costs is due, that issue is not one that need be addressed in relation to the matter now under consideration.

Clause 20.0 of the contract imposes obligations on SELLER, after termination, to "do whatever is necessary and approved by BUYER to preserve and protect WORK already in progress and to minimize all costs to BUYER and SELLER resulting from such suspension or termination." Aramco alleges that Foxboro has violated its post-termination obligations as SELLER. However, no evidence was proffered at the hearing on preliminary injunction to support a finding that Aramco has any valid claim against Foxboro for post-termination costs incurred by Aramco. Instead, Aramco's post-termination claim is that Foxboro has incurred costs in violation of its duty of minimization of post-termination costs. But the Samba guarantee in lieu of 10% retention for WORK performed and invoiced before termination, under a common sense reading of the contract, is not to serve as security for those post-termination costs. Rather, the contract gives Aramco another form of ample security since it has not yet paid any post-termination costs to Foxboro. Thus, Aramco holds not a 10% retention or an "in lieu" bank guarantee but a 100% retention, having not yet paid anything to Foxboro on Foxboro's claims for post-termination costs.

Aramco, standing on its contention that disputes between it and Foxboro must be resolved by arbitration rather than being submitted to this court, has offered no proof to support its allegation that Foxboro has violated its post-termination obligations to minimize costs. For present purposes, therefore, having nothing before me other than bare allegations to weigh against the affidavits submitted by Foxboro, I find that

Foxboro has shown a likelihood of prevailing on its claim that it is not in violation of its post-termination obligations and, indeed, a likelihood of success in showing that Aramco is further indebted to Foxboro for costs incurred by Foxboro after termination.

## VII.

Upon the foregoing findings, I conclude that Aramco's demand upon Samba for payment upon the Samba guarantee of performance of the contract was not to any extent for an "amount which may rightfully be retained pursuant to the contract" and was instead an unjustified pretextual demand made for the purpose of gaining an unfair advantage in settlement negotiations.

There is also a second, independent ground on the basis of which I conclude that Aramco's contention that it may rightfully demand payment upon the Samba guarantee because of alleged post-termination defaults by Foxboro must be rejected. To explain this ground, I note first certain provisions of the contract and their bearing upon the effect of Aramco's termination for its own convenience.

As observed above, performance of the "WORK" that is the subject of the contract was interrupted by Aramco's termination for its own convenience. Foxboro was required by clause 19.1.2 to stop performance of the WORK. Foxboro's obligations under clause 20.0 were not for performance of WORK. This meaning is implicit in the opening phrase of Clause 20.0, "[i]f this Procurement Contract or any portion of the WORK is suspended or terminated...." Instead, Foxboro's post-termination obligations concerned a duty "to preserve and protect WORK already in progress and to minimize all costs to BUYER and SELLER resulting from such suspension or termination." *Id.*

 The Samba guarantee provided, in paragraph D), that it "shall remain valid and in full force and effect until December 31, 1987 or if earlier the date on which supplier has completed the work required

to be performed under the contract." Foxboro contends that the Samba guarantee terminated when the performance of any additional WORK was terminated. Though the argument has some force, I do not rest decision on this ground. Even though Aramco's termination precluded further WORK, nevertheless, as noted above, Foxboro had post-termination obligations "to preserve and protect WORK already in progress and to minimize all costs to BUYER and seller resulting from ... termination." I conclude that the Samba guarantee extended to these obligations of Foxboro, even though they were not WORK. This conclusion follows from the fact that, as Aramco contends, the Samba guarantee extends not only to Foxboro's performance of the WORK but also to "the full and faithful performance of all duties and obligations assumed by SELLER under the Contract...." It is also significant, however, that the phrase immediately following is, "subject to all terms, conditions and limitations set forth therein." Among those terms of the contract are a provision, in clause 3.4.1, that the Samba guarantee in lieu of a 10% retention "shall be valid and binding until all of SELLER's obligations set forth in Paragraph 3.5 of Schedule 'C' and Paragraph 3.0 of Schedule 'F' have been fulfilled." Paragraph 3.5 sets forth obligations of SELLER, to furnish BUYER with specified documentation "[f]ollowing *completion and Final Acceptance of the WORK* and after fulfillment by SELLER of all its duties and obligations under this Procurement Contract...." (Emphasis added). When a 10% retention is used rather than a bank guarantee, SELLER collects that retention only after furnishing the documentation specified in clause 3.5. This clause makes no explicit reference at all to the bank guarantee in lieu of retention. Nevertheless, Aramco argues in effect that clauses 3.4.1 and 3.5 should be read together as allowing Aramco to make a demand upon the bank guarantee in lieu of retention, causing it to be paid in cash without any showing of default or other cause, simply

because the SELLER's obligations under 3.5 have not been fulfilled and cannot be fulfilled for the very reason that Aramco's unilateral termination for its own convenience has made fulfillment impossible at least up to the present time. To read these clauses of the contract as Aramco contends they should be read would be to treat clause 3.4.1 ("SELLER shall provide BUYER with a bank guarantee(s)" in lieu of retention) as if it were meant only to be effective at the whim of Aramco and could be revoked without cause at any time.

The words of the contract will not bear this construction that Aramco proposes. The phrase "[i]n lieu of retaining," in context, plainly means "in lieu of BUYER's retaining." Thus, clause 3.4.1 declares, "In lieu of [BUYER's] retaining" 10% of invoiced WORK, "SELLER shall provide BUYER with a bank guarantee(s) in a form and from a bank acceptable to BUYER for not less than ten percent of the total amount invoiced pursuant to Paragraph 3.1 above...." If BUYER were permitted to demand payment of the bank guarantee without cause, BUYER could do so immediately after signing the contract. Thus, the bank guarantee would be converted into cash immediately rather than serving "in lieu" of cash. Rather than granting BUYER an option to have cash in hand in this way at BUYER's whim (by calling upon payment of the bank guarantee whenever BUYER chose and without cause or explanation), this contractual provision plainly declares that the bank guarantee itself— not the cash that will be paid if and when it is rightfully called—is to serve "in lieu" of a 10 percent cash retention. The arguments advanced about the practice followed in relation to other construction projects (even if private rather than governmental projects) and about Saudi law applying to other projects fails entirely to meet the point that in this instance the contract itself provides unambiguously that the parties have agreed that the bank guarantee is to serve in lieu of cash retention. To read the contract as meaning BUYER can call for payment of the bank guarantee at its whim would be to convert clause 3.4.1 into an illusion.

The conclusion that the contract and the Samba guarantee cannot be construed to give Aramco an unfettered right, without cause, to demand payment upon the Samba guarantee is further strengthened when they are read in context with the Foxboro guarantee, which was delivered on March 31, 1984, two and a half months before the Samba guarantee was delivered. The terms of the Foxboro guarantee make no provision for any special remedy for BUYER when BUYER terminates the contract for its own convenience. In contrast, clause (e) of the Foxboro guarantee does make special provision for certain kinds of claims (including an obligation of guarantor (Foxboro) to "reimburse to BUYER all unearned progress payments previously made by BUYER in respect to the terminated work") but explicitly declares the provisions of paragraph (e) to be applicable "[i]n the event that BUYER terminates the Contract, or any part thereof, *for default* and either itself or through others performs the uncompleted portion of the terminated WORK...." (Emphasis added). The absence of any like provision applying in the event BUYER terminates for its own convenience is significant.

Aramco seeks, in effect, to have this court hold that the contract permits Aramco to terminate for its own convenience, then without any allegation of default (other than claims of earlier default not asserted when terminating and an unsubstantiated claim of breach of Foxboro's post-termination obligations under clause 20.0) to declare unilaterally that Foxboro is in default and, without allowing Foxboro any opportunity for hearing on the unsubstantiated claim of default in any forum, to make demand upon the guarantee and declare that it has the sole right to judge as well as allege the validity and rightfulness of its demand. The terms of the contract will not bear such a perverse and unconscionable construction.

The affidavits filed by defendants regarding Saudi law do not present any basis

upon which I could reach a decision supporting defendants' contentions.

In the first place, these affidavits express conclusions and opinions about the application of legal rules to this case without taking account of the explicit and unambiguous terms of the contract in this case. Counsel's filing of affidavits so interwoven with inadmissible conclusional assertions on any subject as to which proof by affidavit is appropriate is a disservice to the court. Plainly the court cannot credit conclusional assertions in affidavits that could not properly be received in evidence in a testimonial hearing. These affidavits do not refer to source materials on the basis of which a reasoned determination of applicable rules of Saudi law could be made. Second, all affidavits before me, including those filed by plaintiff (which also have deficiencies as conclusional) recognize, in common, that contractual obligations are sacred under Saudi law and that when the contractual provisions are unambiguous and not in conflict with Saudi law, they are to be construed and enforced in accordance with their plain meaning. This is, of course, entirely consistent with the law of Massachusetts and other American states.

I have concluded that the terms of the contract and the Samba guarantee are, in all respects relevant to the issues before me, clear and unambiguous. No basis is shown for an assumption that Saudi law would treat Aramco's violation of those terms, and Aramco's untenable arguments for a different construction of the agreements, with any less disfavor than does the law of Massachusetts.

### IX.

Apparently all defendants join in contending that the Citibank Int. letter of credit is unconditional and that Citibank Int. is required to pay upon demand without regard to whether the demand is wholly unjustified or even fraudulent. I need not determine the validity of this contention, however, for the purposes of the motion for preliminary injunction. Even assuming that the letter of credit is unconditional and that Citibank Int. is required, in the absence of a court order, to pay on demand, this court may enjoin such payment to protect Foxboro from an unlawful demand by Aramco or Samba. In analogous circumstances, courts, in order to protect the interest of one or another of the parties before them, routinely attach assets held by third parties who would otherwise have an unconditional obligation to release the assets on demand. *See* Fed.R.Civ.P. 64; *Lechman v. Ashkenazy Enterprises, Inc.*, 712 F.2d 327, 330 (7th Cir.1983); *Ross v. Peck Iron and Metal Co.*, 264 F.2d 262, 268 (4th Cir.1959).

An order that merely enjoined Citibank Int. from seeking reimbursement from Foxboro would protect Foxboro's interest as fully as an order enjoining payment on the letter of credit in the first instance. Such an order would, however, leave Citibank Int. vulnerable to a demand that it would be powerless to refuse, according to its own contention, but for which it would be enjoined from seeking reimbursement. For this reason a broader order enjoining any payment by Citibank Int. on the letter of credit is better suited to protect the interests of both Citibank Int. and Foxboro.

### X.

For the reasons stated in Parts I–VIII of this Memorandum, I conclude that Foxboro has shown a likelihood of success on the merits of its claim that Aramco's and Samba's demands were unjustified. In so concluding, I have applied the standards for showing likelihood of success expressed in First Circuit decisions, *e.g.*, *Auburn News Co., Inc. v. Providence Journal Co.*, 659 F.2d 273, 277 (1st Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). I need not and do not adopt the less demanding standard for which plaintiff has argued, citing precedents from other circuits, *e.g.*, *American Hospital Supply Corp. v. Hospital Prod-*

*ucts, Ltd.,* 780 F.2d 589, 593–94 (7th Cir. 1986).

I conclude that plaintiff has also satisfied the three other prerequisites for preliminary injunction identified by the First Circuit:

> (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant[s]; ... and (3) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d at 1009 (citations omitted).

■ First, I conclude that plaintiff has met its burden with respect to the irreparable injury requirement. Defendants argue that plaintiff has an adequate remedy for any injury it may sustain in the form of a money judgment rendered by the Saudi Arabian arbitrator and enforceable against the defendants in both Saudi Arabia and the United States. Even if all of defendants' contentions—that the letter of credit and guarantee disputes are within the arbitrator's jurisdiction; that the arbitrator is empowered under applicable Saudi law to render a money judgment that would compensate plaintiff for any payment on the guarantee or letter of credit if either were wrongfully paid; and that such a judgment could both be enforced and as a practical matter be satisfied in the United States, at least as against defendants Aramco and Citibank Int.—are taken as correct, plaintiff has shown other injury which is irreparable.

In the first place, Aramco will obtain an unfair advantage in the ongoing negotiations for final settlement between the parties. I conclude that this serious harm is of a type that may never be adequately compensated, if compensated at all. In addition, Foxboro will suffer indirect or secondary harm from the illegitimate economic pressure imposed on it, including harm to its business reputation. The injury to Foxboro's business reputation that may result from reports that demand and payment were made for two and one-half million dollars on its letter of credit, upon a charge and certification by Aramco of breach of contract, is a type of injury that warrants preliminary relief. *See Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970); *Janmort Leasing, Inc.,* 475 F.Supp. at 1294–95. It is doubtful whether injury of this kind is legally compensable; moreover, even if such injury could be the basis of a valid claim for money damages against Aramco, the difficulties of proof create a severe risk that the harm suffered would go uncompensated. I conclude that plaintiffs have more than met their burden to show irreparable harm.

■ I also conclude that this irreparable harm to plaintiffs outweighs any harm to the defendants. First, because the order will protect Citibank Int. from having any demand made upon it, it can sustain no harm. The same principle applies to Samba; that is, because the order enjoins Aramco from making any demand, Samba is protected from any harm that would follow if it had to make payment on the guarantee but could then not recover its payment from Citibank Int. or Foxboro. I note that the evidence clearly indicates that Samba made a $2,526,550 payment to Aramco on or about February 22, 1986. Samba, after express invitation by the court, has chosen at least thus far not to submit this matter to the jurisdiction of this court. I therefore cannot, in considering whether preliminary injunction should be denied because of the balance of harm, give weight to alleged interests of Samba that it is unwilling for this court to evaluate, including its suggestion that harm may accrue because it made a payment. If Samba were to submit to this court a claim for relief from any party with respect to its payment to Aramco, the court would need to address first whether Samba took any steps in furtherance of that payment in violation of the court's temporary restraining order. Samba thus far has not offered evidence on the basis of which I could find there was no violation.

In the absence of such a showing, it would be particularly inappropriate to give any weight to the alleged harm resulting from that payment to Aramco for which it may make no demand on Citibank Int.

I conclude also that any harm to Aramco does not outweigh the irreparable harm which plaintiffs would suffer without the injunction. To the extent Aramco can ultimately prevail on its contention that it is entitled to the payment it demands, it can be compensated by a money judgment. Furthermore, Aramco now holds a 100 percent retention on all payments owing to Foxboro for post-termination costs.

■ The final prerequisite to the issuance of a preliminary injunction, that the public interest not be adversely affected by the injunction, has also been met by plaintiffs. There is no public interest in permitting one party to a contract to act pretextually and wrongfully for the purpose of gaining an unfair advantage in negotiation. The public interest is just the opposite—in preventing such action.

As noted in Part XII, infra, there is cause for concern that actions were taken by Aramco and Samba, after notice of this court's Temporary Restraining Order, to implement and effectuate the wrongful demands by Aramco upon Samba and by Samba upon Citibank Int. A determination as to whether such contumacious conduct occurred, however, is not a prerequisite to the preliminary injunction sought by Foxboro. Even if actions were taken by Aramco and Samba without notice of the Temporary Restraining Order, Foxboro has nevertheless established a probability of success on its claims that they were wrongful as against Foxboro and that failure of this court to enter a preliminary injunction to protect Foxboro against their having effect on its interests before final resolution of this controversy on the merits would result in irreparable harm.

Finally, given the chronology of events as I find them, as set forth in the Appendix attached to this Memorandum, I find that Citibank Int. had not made payment to Samba before actual notice of the TRO

issued from this court on February 20, 1986, and that any actions taken thereafter (whether or not in contempt of this court because committed in violation of and with actual notice of its order) did not effectuate payment. In these circumstances I conclude that a preliminary injunction should issue, in terms identical to those of the TRO except for modifications that may be appropriate for clarity or on other grounds proposed by any of the parties and consistent with the findings and conclusions stated in this Memorandum.

### XI.

I find that, in the circumstances of this case, no form of security is required pursuant to Fed.R.Civ.P. 65(c). As with the balance of harm issue, neither Samba nor Citibank Int. will sustain any losses as long as no demand can be made of them. The $2,526,550 that Samba has already paid to Aramco is, as discussed in Part X, not a matter that the parties have submitted to this court for resolution. I therefore exclude it from the consideration of the security requirement.

■ I conclude also that a security deposit is not needed to protect Aramco's interest because of the combination of the following two circumstances. First, the bank guarantee and letter of credit remain in effect. Losses ultimately sustained by Aramco could thus be compensated by means of the guarantee and letter of credit, if within its scope. Second, Aramco now holds a 100 percent retention on payments due Foxboro for post-termination costs. I find there is no likelihood that Aramco will sustain damages in excess of the combined amount of the bank guarantee and letter of credit and the retained termination costs. I therefore conclude that no security deposit by plaintiff is necessary.

### XII.

I find cause for concern that each of the defendants may have acted, after actual notice of the TRO, in contempt of this court and its order.

Not only did Citibank Int. fail to communicate with its agents and affiliates to forestall actions forbidden by the TRO but also in the evidence before me, including that as to the chronology of events occurring from February 12 through February 25, *see* Appendix to this Memorandum, and beyond, is compelling support for the inference that this failure to act was at the least in reckless disregard of the obligations of responsible representatives of Citibank Int. having actual notice of the TRO to inform other representatives whom they knew to be in positions likely to take actions contrary to the order of this court if not informed of the TRO.

As to the actions of other defendants, it is undisputed that telexes reciting the Temporary Restraining Order reached the offices of defendants Samba and Aramco, at Al-Khobar, Saudi Arabia, and Dharan, Saudi Arabia, respectively, by 7:32 p.m. Saudi time on Friday, February 21. Defendants Samba and Aramco contend, however, that they had not received actual notice of the Temporary Restraining Order at the time they took actions to make and satisfy the demand (8:30–8:40 a.m. Saudi time, Saturday, February 22). They contend that these actions were therefore neither contumacious nor ineffective.

I find the delays in communication of information about this court's TRO to other representatives of each defendant, after one or more attorneys or other representatives had actual notice, to be far longer than would be consistent with the expectations of a well managed and efficient commercial organization, no matter how large it is and how widely its representatives may be dispersed around the globe. Defense counsel have argued the matter before this court as if it were the obligation of Foxboro to fathom the intricacies of each of defendant's extensive operations and prove delivery of notice directly to the company representative with authority to forestall actions by any company representatives in violation of this court's order. This contention is plainly incorrect, as a matter of law. A legal entity, such as each

of the defendants, has knowledge of the TRO, at the latest, when a representative receives it and thereafter has had reasonable time within which to communicate it to other representatives whom he knows to be representatives who might take action in violation of the TRO if not informed. A legal entity may not rely upon its own size, the dispersion of representatives and responsibilities, and its own chosen pace of communication to allow it a period of not merely hours but days to act in ways that may then be alleged to have accomplished changes that place it beyond the power of the court to restore circumstances to substantially those existing at the time its TRO was issued.

I find cause for concern with respect to the actions of defendants for a second reason. None of the affidavits submitted by any of the defendants, with one exception, makes any mention of a second obvious avenue by which it might have received actual notice of the Temporary Restraining Order. Citibank Int. ordered a freeze on its payment to Samba shortly after 9:00 a.m. on Friday, February 22, 1986. One would expect that in the ordinary course of business notice of this action and the reason it was taken would have been made immediately to concerned parties, including the other defendants and particularly Samba. Yet none of the affiants, with the exception of Attorney Claman who indicated he ordered such notice simultaneously with the freeze, makes any mention of the conveyance or receipt of such notice— notice that would have acted as actual notice of the Temporary Restraining Order. I find this conspicuous absence a further cause for concern that one or more of the defendants may have acted in violation of the order of this court.

I do not delay resolution of the motion for preliminary injunction to determine what, if any, action this court should take regarding the likelihood that contumacious conduct has occurred. It may be that final determination on these matters, either on motion of a party or at the instance of the court, should be deferred pending opportu-

nities for discovery. Any party desiring action by the court, whether in support of a contempt finding against another party or in support of a determination that the moving party's conduct was not contumacious, may by motion seek a hearing and action by the court.

<u>Chronology</u>

| | |
|---|---|
| Eastern Standard Time | [where relevant, time in another time zone is indicated in brackets]<br>Filed documents are referred to by number, preceded by "D#." |
| February 12, 1986 | Citibank Int. received telex from Samba demanding payment under letter of credit (D# 62, paragraph 2)<br>Citibank Int. advised Samba telex demand not properly authenticated or tested (D# 62, paragraph 3)<br>Citibank Int. notified Foxboro of Samba's demand (D# 62, paragraph 4) |
| February 13, 1986 | Citibank Int. received letter from Foxboro advising Citibank Int. it would be improper for Citibank Int. to honor Samba's demand (D# 62, paragraph 5)<br>Citibank Int. received authenticated telex demand from Samba (D# 62, paragraph 6) |
| February 15, 1986 | Samba advised TIG–TESCO that it had referred to the Saudi Arabian Monetary Authority ("Sama") the issue of whether the guarantee was properly payable and that Samba would await decision of Sama before determining whether to make payment to Aramco (D# 21, paragraph 6) |
| Thursday, February 20<br>Shortly before 5:00 p.m. | Telephone conversation between Claman (Citibank Int. legal dep.) and Woodlock (Foxboro counsel) concerning expected time of honoring demand for payment on letter of credit (D# 6, page 2; D# 62, paragraph 13) |
| 4:50 p.m. | Foxboro files motion for Temporary Restraining Order ("TRO") |
| 5:00 p.m. | Claman ordered payment to Samba (D# 62, paragraphs 13–14) |
| 5:45 p.m. | Citibank Int. effected wire transfer of $2,526,550 from Boston office in payment of letter of credit to a Samba acct. in New York (D# 28, page 7) |
| 6:10 p.m. | TRO issued |
| 7:00 p.m. | Notice of TRO received by Citibank Int. in Boston (D# 28, page 7) |
| Friday, February 21<br>Shortly after 9:00 a.m. | Citibank Int. orders freeze of $2,526,550 paid to Samba and orders Samba be notified of freeze (D# 62, paragraphs 15–16) |
| 11:17 a.m.<br>[7:17 p.m. Saudi time] | Foxboro counsel telexes notice of TRO to Daniel Hussey, Samba, Al–Khobar, Saudi Arabia (D# 19, paragraphs 4–6, Affidavit of Shelley M. Nose) |

11:32 a.m.
[7:32 p.m. Saudi time] Foxboro counsel telexes notice of TRO to General Counsel, Aramco, Dharan, Saudi Arabia (D# 19, paragraphs 7–10, Affidavit of Shelley M. Nose). Dharan is approximately 7 miles from Al–Khobar (D# 18, paragraph 2)

Saturday, February 22
Morning Sama had yet made no ruling whether Samba should honor Aramco's demand (D# 32, paragraph 4)

12:30 a.m.
[8:30 a.m. Saudi time] Aramco makes demand for payment on Samba at Al–Khobar (D# 18, paragraph 2)

12:40 a.m.
[8:40 a.m. Saudi time] Samba makes payment of $2,526,550 to Aramco by means of Samba check No. 884508491 for which Citibank (New York State), N.A. was the drawee bank (D# 18, paragraph 2; D# 22, paragraph 3)

2:15 p.m. Undisputed that responsible representatives of all parties had actual knowledge of TRO

February 23, 1986
4:00 a.m.
[12:00 noon Saudi time] Aramco exchanged Samba check No. 884508491 with Samba for 9,200,918.12 Saudi Ryals (D# 43, paragraph 5)

February 24, 1986 Samba forwarded check No. 884508491 to Citibank, NA for deposit. Samba's account with Citibank, N.A. was then credited in the amount of $2,526,550. Citibank, N.A. sent check No. 884508591 to drawee bank Citibank (New York State), N.A. for payment (D# 28, page 9).

February 25, 1986 Citibank (New York State), N.A. paid check No. 884508491 (D# 28, page 9)

---

## ORDER

For the foregoing reasons it is ORDERED

(1) After opportunity for further hearing as provided in paragraph (2) below, a preliminary injunction will be issued on terms identical with those of the Temporary Restraining Order, subject to such modifications, consistent with the foregoing Memorandum, as may be proposed by any party and approved by the court. Until that preliminary injunction is entered, the Temporary Restraining Order remains in effect.

(2) Counsel shall consult with each other to determine whether agreement can be reached as to the form of the preliminary injunction to be issued in accordance with this Memorandum. If no agreement is reached, each party may file, on or before Monday, May 12, 1986, its proposal as to the form of order to be entered and a hearing to determine the form of order will be held at 2:15 p.m., on Thursday May 15, 1986.